77 F.3d 491
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Irvin W. WETTLAUFER and Joan Wettlaufer, Plaintiffs-Appellants,
v.
MT. HOOD RAILROAD COMPANY, Defendant-Appellee
 No. 95-35016.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Jan. 8, 1996.
Decided Feb. 6, 1996.
 
 Before: NOONAN, LEAVY, and HAWKINS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 FACTS AND PROCEEDINGS
 
 2
 On September 9, 1990, plaintiffs Irvin and Joan Wettlaufer boarded as passengers defendant Mt. Hood Railroad Company's train, which runs from Hood River to Parkdale, Oregon, and back. Shortly after departing from the Parkdale station, the train's engine decoupled from the passenger cars, thereby activating the engine's emergency brakes and bringing the engine to a stop. The passengers cars then collided with the engine. The Wettlaufers were on the third passenger car. Irvin Wettlaufer claimed that the abrupt stop caused his body to move forward, with his knee striking a vertical bar inside the train, and then suddenly backward into the seat, with his head jerking back.
 
 
 3
 The Wettlaufers sued Mt. Hood Railroad for negligence and violations of federal statutes and regulations governing railroads. Irvin Wettlaufer sought damages for his injuries, which he claimed were "a wrenching, twisting, tearing and straining of the muscles of his cervical spine causing severe pain and stiffness of the neck and shoulders; concussion and trauma to the brain; persistent and chronic post-traumatic headache; pain in the left knee and leg; pain and intermittent numbness of the left and right arms; and thoracic outlet compression of the right side resulting in a limitation of the range of motion and diminished muscle strength of the right hand and arm," which required in 1993 "surgery to relieve the thoracic outlet compression by removal of the first right rib and the anterior scalene muscle of the right shoulder." Joan Wettlaufer claimed loss of her husband's consortium.
 
 
 4
 Before trial, Mt. Hood Railroad admitted "responsibility for the accident and any damages which plaintiff suffered," but continued to deny "that plaintiff was injured or the nature and extent of his injuries and damage." The jury was asked to determine causation and the extent, if any, of damages.
 
 
 5
 At trial, the Wettlaufers thrice objected to testimony from Mt. Hood Railroad's expert Robert Piziali, a biomechanical engineer whose consulting firm reconstructed the accident. The objections were to Piziali's testimony that, based on the reconstruction of the accident and his reading up on the causes of thoracic outlet syndrome, the kind of impact in the accident was not consistent with Irvin Wettlaufer's thoracic outlet syndrome.
 
 
 6
 The first objection arose during the following exchange:
 
 
 7
 [Piziali:] The first thing I obviously looked at was the thoracic outlet syndrome. Because thoracic outlet syndrome, I believe, was one of the diagnoses. Looking at that, thoracic outlet syndrome is almost always considered to be a cumulative trauma problem. It doesn't mean it can't happen acutely, but it is classically a cumulative trauma problem.
 
 
 8
 [Wettlaufers' counsel:] Your Honor, I am going to object at this point to Mr. Piziali offering testimony in the nature of a medical opinion despite his substantial background in the mechanical engineering field. I submit that an inadequate foundation has been laid for him to render an opinion on these matters.
 
 
 9
 * * *
 
 
 10
 [M]y objection is to him providing testimony in this case to the issue of the forces of this impact as it relates to [a] particular ... medically defined syndrome such as the thoracic outlet syndrome.
 
 
 11
 The court overruled the objection for the time being. Piziali then testified about thoracic outlet syndrome and its possible causes. He described the syndrome as a condition involving pressure on the nerves and blood vessels near the thoracic outlet. He claimed that the syndrome could be caused by the following factors, which build up over time: (1) "a congenital abnormality which is called a cervical rib," (2) "an abnormally large first rib," and (3) "unnatural characteristics or shapes in the clavicle." He also described several acute factors, which could cause the syndrome: (1) a fracture to the clavicle or the first rib, (2) a "very severe whiplash motion," (3) a "direct blow" to the tissue that causes hyperabduction. Piziali stated that "[t]here's [sic] two reasons why I don't believe thoracic outlet syndrome is consistent with this event," at which point the Wettlaufers' counsel objected to Piziali's "giving any opinion testimony with respect to this event causing or not causing thoracic outlet syndrome on the grounds of lack of foundation--inadequate foundation has been established to able him to render an opinion on that matter, a medical opinion."
 
 
 12
 The court then ordered the jury to retire to the jury room and considered the objection. Mt. Hood Railroad's counsel explained the scope of Piziali's testimony:
 
 
 13
 [W]hat he's talking about is what I intended to ask is: How do you analyze the forces in this accident applied to the area which is involved in the thoracic outlet syndrome. And is there enough force there to biomechanically do anything to these body parts. It's like the study: Is there enough force in the ski accident to break a bone.
 
 Piziali added:
 
 14
 Doctors diagno[se] causality based on history. And history is not sufficient, in my mind, to determine causality. Causality, you have to have the event producing the forces. The forces have to produce the injuries. That's biomechanics. I'm not arguing whether he does or doesn't have thoracic outlet syndrome. That's a diagnosis. What I'm saying is: What's the causal relationship between this event and thoracic outlet syndrome. That's biomechanics.
 
 
 15
 The court then identified two potential problems in Piziali's proffered testimony: (1) one would expect a physician, not a biomechanical engineer, to testify about the reason for Mr. Wettlaufer's medical condition, and (2) Piziali's reading of literature on thoracic outlet syndrome does not necessarily qualify him to testify on the syndrome. Piziali was allowed to explain his qualification to testify on this issue, apparently analogizing the study of thoracic outlet syndrome to the study of bulging discs. Piziali described his methodology as being based on review of literature on reconstructed accidents on "animals, cadavers, volunteers at low levels," and lab tests. [Later, in cross-examination, Piziali admitted that he had not personally performed any tests on cadavers to duplicate a thoracic outlet compression.] He claimed that biomechanical engineering is "a well-documented field" in which he had taught as a professor and had been given over a half million dollars in government money to perform studies on how people are injured. He also stated that he was a part of the Orthopedic Research Society, and that the Society of Automotive Engineers has a biomechanical group at its crash conference.
 
 
 16
 Mt. Hood's counsel argued that the Federal Rules of Evidence permit experts to consider literature in the field in rendering an opinion and that Piziali's testimony could be analogized to a lawyer's giving expert testimony "on tort issues" not because of actual experience in trying such cases, but because of having "studied the law and the decisions." The court acknowledged:
 
 
 17
 I tried a case as a judge without objection. The lawyer was allowed to testify as to what the Supreme Court would do if a case on appeal had a certain piece of evidence.
 
 
 18
 [Mt. Hood's Counsel:] Sounds like a malpractice case.
 
 
 19
 [The Court:] Yeah. It was. All right. The objection is overruled.
 
 
 20
 After the court ruled, the Wettlaufers' counsel objected a third time:
 
 
 21
 I want to be sure that the record is clear that my position is that this witness's testimony is outside his area of expertise, education, and training, and it is getting into the area of medical opinion. I respectfully submit that he lacks the adequate background in order to render an opinion in regard to the actual injury sustained by Mr. Wettlaufer.
 
 
 22
 On November 23, 1994, after an afternoon of deliberating, the jury returned a verdict in favor of the defendant Mt. Hood Railroad. On December 23, 1994, the Wettlaufers timely filed a notice of appeal.
 
 ANALYSIS
 
 23
 We conclude that the district court erred by admitting Piziali's testimony without first verifying its validity under the Daubert test. Although the Wettlaufers did not explicitly challenge the scientific validity of Piziali's testimony at trial, their repeated objections clearly raised a matter which concerns the second prong of the Daubert test for proffered scientific expert testimony, or whether the proffered expert testimony "fits" the facts of the case. Daubert v. Merrell Dow Pharmaceuticals, 113 S.Ct. 2786, 2796 (1993) ( Daubert I ). Piziali's qualifications in mechanical and biomechanical engineering and accident reconstruction do not, in themselves, qualify him to testify about what forces could produce thoracic outlet syndrome. Under Daubert, the district court should have inquired whether there is a valid scientific connection between biomechanical engineering and Piziali's testimony on what forces could cause thoracic outlet syndrome. Id. ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."); Daubert v. Merrell Dow Pharmaceuticals, 43 F.3d 1311, 1317-18 (9th Cir.1995) (Daubert II ). The district court abused its discretion by failing to do so.
 
 
 24
 We do not find that reversal is required in this case, however, because we do not find that it was more probable than not the error tainted the verdict. See Ortega v. O'Connor, 50 F.3d 778, 780 (9th Cir.1995). First, we find it significant that the jury did not find for Irvin Wettlaufer on any of the other injuries alleged by him, which included stiffness of the neck and shoulders, concussion and trauma to the brain, chronic headaches, and pain in the left knee and leg. Even if the jury believed Piziali's testimony on thoracic outlet syndrome, it could have found for Wettlaufer on his damages claim for the other injuries. That the jury found no injury suffered by Wettlaufer for which Mt. Hood Railroad was responsible suggests that the jury's verdict did not ultimately rest on Piziali's testimony on thoracic outlet syndrome. Although it is conceivable that Piziali's testimony on thoracic outlet syndrome so influenced the jury that it disbelieved Wettlaufer on his other claims of injury, we do not believe Piziali had such an influence on the jury, given the spirited cross-examination by Wettlaufer's counsel, in which it was revealed that Piziali worked 90 percent of the time on behalf of defendants in litigation; that his estimated fee for Mt. Hood Railroad was $26,000 plus trial testimony; that he was "not licensed to practice medicine," "diagnose patients," or "prescribe medication"; and that he had not "personally conducted any tests on cadavers ... [to] duplicate a thoracic outlet compression." In addition, Piziali's conclusion was supported by an alternative, medical ground. Another one of Mt. Hood Railroad's experts, Dr. Richard Rosenbaum, a neurologist, testified that based on his two examinations of Irvin Wettlaufer, Wettlaufer did not have thoracic outlet syndrome in June 1992, and even if he did later develop the condition, "it certainly couldn't be related to the injury that occurred in 1990." This evidence provides an independent ground on which the jury could have found that Mt. Hood Railroad was not responsible for Wettlaufer's thoracic outlet syndrome and supports our conclusion that the jury's verdict was not tainted by Piziali's testimony on thoracic outlet syndrome. Finally, the jury had other evidence on which to base its decision that Wettlaufer should not recover from Mt. Hood Railroad for his thoracic outlet syndrome, for it was disputed at trial by Dr. Rosenbaum whether Wettlaufer even had thoracic outlet syndrome.
 
 
 25
 Accordingly, we AFFIRM.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Cir.R. 36-3